## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SL Montevideo Technology, Inc.,

                              Plaintiff,

                                             Civ. No. 03-3302 (RHK/FLN)
                                             **MEMORANDUM OPINION
                                             AND ORDER**

v.


Eaton Aerospace, LLC,
and Astromec, Inc.,

                              Defendants.

Mark H. Verwys, Plunkett and Cooney, PC, Grand Rapids, Michigan, and David A. Engen, Baxter Engen Ltd., Burnsville, Minnesota, for Plaintiff.

Michael H. King, Elizabeth M. Bradshaw, and Ronald Banerji, LeBoeuf, Lamb, Greene & MacRae, LLP, Chicago, Illinois, and Frederick W. Morris and Timothy P. Griffin, Leonard, Street and Deinard, PA, Minneapolis, Minnesota, for Defendants.


### Introduction

The parties in this case play critical roles in the manufacture of Boeing's 737 airplanes. Eaton manufactures the stabilizer trim motor ("STM"), which adjusts the horizontal portion of the airplane's tail section. SL Montevideo had developed and manufactured a brushless direct-current motor for Eaton's STM. Later, Astromec developed and manufactured a similar motor for Eaton. What took place during the switch from SL Montevideo to Astromec as the source for the motor gives rise to the

current litigation.  SL Montevideo alleges that both Eaton and Astromec misappropriated

its trade secrets, and that Eaton breached a non-disclosure agreement.  Before the Court

are eight matters, the most consequential of which are motions by Eaton and Astromec for

summary judgment.  The summary judgment motions will be denied, and the remaining

matters will be resolved as set forth below.

## Background

I.      **The SL Montevideo-Eaton Relationship**

From 1994 though 2004, SL Montevideo produced brushless direct-current

motors for Eaton.  Over this time, SL Montevideo's motor went through three iterations:

the "Size 18," the "-01 Motor," and the "-02 Motor."  In 1994, SL Montevideo built the

Size 18, but that design was eventually scrapped.  (See Kjer 1/13/05 Dep. Tr. at 34, 59.)

In 1995, it designed the -01 Motor and sold it to Eaton from 1996 to 2000 until problems

arose[1] and the motor was redesigned.  (See id. at 96-97.)  This redesign led to the -02

Motor, which was sold to Eaton until recently.  (See id. at 98; Houchens 1/6/05 Dep. Tr.

at 6-8.)  The -02 Motor produces a large amount of power from a relatively small size.

---

[1] Apparently as a result of these problems, Eaton sued SL Montevideo in August
2000 in the United States District Court for the Western District of Michigan.  A jury
found SL Montevideo liable for breach of express and implied warranties and awarded
Eaton $650,000 in damages.  That verdict was upheld on appeal.  See Eaton Aerospace,
LLC v. SL Montevideo Tech., Inc., 2005 WL 705774 (6th Cir. March 29, 2005)
(unpublished).
    Astromec argues that SL Montevideo has used evidence from the Michigan
litigation in this case in violation of the Michigan court's protective order.  (See Astromec
Reply Mem. in Supp. at 15.)  To the extent this is true, Astromec may propose a limiting
instruction to be read to the jury at trial.  See 8th Circuit Civil Jury Instr. § 2.08B.

(SL Montevideo App. 12-21 ("Kjer Report") at 4.)  To achieve this result, the motor is comprised of several components, including certain lamination geometry, magnets, copper windings, and lightweight materials (aluminum, samarium cobalt).  (Id. at 9-14.)

In connection with the redesign of the -02 Motor, SL Montevideo and Eaton in January 2000 signed a "Proprietary Information Agreement" ("Agreement"), which provides that each party "shall keep in confidence and not disclose to any person . . . any of the other Party's Proprietary Information."  (Eaton's Mem. in Supp. Ex. 5 (Agreement) ¶ 3.)   "Proprietary Information" is defined as "information" which:

> a) is recorded information, regardless of the form or method of recording, of a scientific or technical nature . . . , including, but not limited to, drawings, specifications, computer software and financial information, which has been marked as proprietary (or with words of similar meaning) by a stamp or other written or recorded identification by the originating party prior to disclosure or after disclosure if the Proprietary Information was inadvertently not marked prior to disclosure;

> b) if in oral or visual form, has been preceded by an assertion of "proprietary" (or after disclosure if the Proprietary Information was inadvertently disclosed prior to assertion of "proprietary"); and has been subsequently reduced to a written or recorded form which identifies that oral or visual disclosure as Proprietary Information by a stamp or other tangible medium, and delivered to the receiving party within thirty (30) days of such oral or visual disclosure.

(Agreement ¶ 2.)

Under the Agreement, neither SL Montevideo nor Eaton is liable for disclosure of Proprietary Information if such information

> a) were in the public domain at the time it was disclosed to the receiving party, or thereafter passes into the pubic domain except by wrongful act of the receiving party; or

3

b) were known to the receiving party at the time of the disclosure thereof, or thereafter becomes known from a source other than the disclosing party without breach of this Agreement.

c) is disclosed to others on a non-restricted basis by the party claiming proprietary rights thereto;

d) is independently developed by the receiving party without reference to the information of the disclosing party.

(Agreement ¶ 3.)  The parties agreed to treat previously disclosed Proprietary Information in accordance with the Agreement.  (Id.)

Both before and after the execution of the Agreement, Eaton personnel had intimate knowledge of SL Montevideo's motor.  Some of those employees included Tom Blair, Dennis Paauwe, and Ross DeJong.  Blair, an Eaton engineer, was considered to know the most about the SL Montevideo motor.  (See Paauwe 9/17/04 Dep. Tr. at 40; Blair 9/2/04 Dep. Tr. at 6, 25-26.)  Paauwe, another Eaton engineer, had reviewed the mechanical design of the SL Montevideo motor, participated in face-to-face meetings with SL Montevideo employees, had access to SL Montevideo motor drawings, and conducted engineering analyses.  (See Paauwe 9/17/04 Dep. Tr. at 35-36, 42-43, 70; Blair 9/2/04 Dep. Tr. at 90-93.)  DeJong, Eaton's STM Program Manager, viewed SL Montevideo design documents and viewed SL Montevideo's motors dozens of times.  (See DeJong 8/31/04 Dep. Tr. at 50-52.)  At the time the Agreement was signed, Eaton possessed two full sets of SL Montevideo's final motor specification drawings—one at its Los Angeles facility and one at its Grand Rapids facility.  (See Snell 4/12/05 Dep. Tr. at 63-64, 93, Exs. 120-21; DeJong 8/31/04 Dep. Tr. at 68.)

4

SL Montevideo's policy was to stamp proprietary documents as "confidential" or "proprietary." (See Snell 4/12/05 Dep. Tr. at 32-36.) Eaton personnel understood that SL Montevideo's motor design was proprietary. As early as June 1996, some four years before the Agreement was signed, Eaton's Blair recognized SL Montevideo's motor designs as proprietary. (See Blair 10/12/01 Dep. Tr. at 220.) The official minutes of a June 1996 design review meeting also refer to SL Montevideo's "proprietary detail drawings." (See id. Ex. 324.) Eaton's DeJong also considered SL Montevideo's motor, "taken as a whole," as proprietary, and viewed SL Montevideo as the owner of its motor design. (DeJong 8/31/04 Dep. Tr. at 51, 146.)

In March 2001, Eaton notified SL Montevideo that it was redesigning its STM and requested a bid on a redesigned motor. SL Montevideo declined. (See Houchens 1/6/05 Dep. Tr. at 45-46, 56.) Left without a motor supplier, Eaton opened up bidding to others, including Astromec. (Blair Decl. ¶ 5.) In June 2001, Eaton chose Astromec to supply the new motor. (See Castle 8/20/04 Dep. Tr. Ex. 27.) In January 2002, SL Montevideo reconsidered its decision and agreed to redesign the -02 Motor. (See Snell 4/12/05 Dep. Tr. at 27.) In April 2002, however, SL Montevideo changed course and advised Eaton that it would not supply the redesigned motor. (See id. at 17.)

## II.    The Eaton-Astromec Relationship

When Eaton selected Astromec to design the brushless direct-current motor for the redesigned STM in June 2001, Eaton and Astromec were not strangers. In 1997 and 1998, Eaton approached Astromec to become a second source for the motor, but

Astromec had never designed a motor like it before and nothing materialized.  (See Fanelli 7/1/04 Dep. Tr. at 127-28, Ex. 86; Gustafson 1/20/05 Dep. Tr. at 74; Castle 8/19/04 Dep. Tr. at 152-56, 168-69, 173-76, Ex. 86; Coppens 9/16/04 Dep. Tr. at 16-20, 29-30.)  In November 1999, Eaton again tried to "run a parallel path" with Astromec as a source for the motor.  (Blair 9/2/04 Dep. Tr. at 122-23.)  Eaton personnel met with Astromec personnel to discuss "technical issues visible from [Eaton's] dealings with [SL Montevideo]."  (Blair 9/2/04 Dep. Tr. at 122-23, 118-19, Ex. 201; see Coppens 9/16/04 Dep. Tr. at 77-78, Ex. 199; Fanelli 7/1/04 Dep. Tr. at 162-69; Castle 8/19/04 Dep. Tr. at 205-10.)

From November 1999 through April 2001, Eaton was apparently still considering Astromec as a source for the motor.  In April 2001, Eaton personnel expressed concerns about Astromec's lack of experience.  (See DeJong 8/31/04 Dep. Tr. at 73-74, Ex. 178.)  In May 2001, Eaton doubted Fanelli's qualifications as Astromec's motor designer.  (See Fanelli 7/1/04 Dep. Tr. at 177-81, Exs. 21, 24; Castle 8/19/04 Dep. Tr. at 233-35.)  At some point, Eaton's DeJong learned that Astromec had never made a similarly sized motor and Eaton's Larry Martin (an engineer) questioned Astromec's ability to make such a motor.  (See DeJong 8/31/04 Dep. Tr. at 91-93; Gustafson 1/20/05 Dep. Tr. at 74; Coppens 9/16/04 Dep. Tr. at 34-36.)  Boeing was also concerned about Astromec's capabilities.  (See Castle 8/20/04 Dep. Tr. at 305-06.)

Despite these concerns, Eaton selected Astromec to design and manufacture the motor in June 2001.  The parties executed a "Statement Of Work," which provided that

"the motor properties called out in the [new] spec[ification] are nearly identical to those called out for in the current in-production motor."  (Castle 8/20/04 Dep. Tr. Ex. 27 at 6.) Astromec's Fanelli understood that Astromec's motor had to "stay the same" and "perform pretty much the way" that the SL Montevideo motor performed.  (Fanelli 7/1/04 Dep. Tr. at 171-72, Ex. 101.)  At that time, Fanelli had not previously designed an aeronautical motor that had ended up in production.  (Id. at 38-39.)  Eaton's Blair stated that his intention was "to try to guide the [Astromec] design" as best he could.  (Blair 9/2/04 Dep. Tr. at 195.)

On June 27, 2001, Eaton held a Preliminary Design Review for Astromec's motor. (DeJong 8/31/04 Dep. Tr. at 103, 107-08, Ex. 32.)  Appearing on behalf of Eaton were Blair, Paauwe, and DeJong.  (See id.)  The purpose of the review was to "positively influence Astromec's design before their design becomes finalized."  (Id. at Ex. 32.)  But the review apparently did not go well.  On July 6, 2001, Astromec's Fanelli emailed Astromec's Castle, stating that the success of Astromec's agreement with Eaton may be in jeopardy.  (Castle 8/20/04 Dep. Tr. Ex. 105.)  On July 12, 2001, Boeing wrote to Eaton's Blair stating that it had "concerns resulting from the Astromec [review] . . . that lessons learned in the . . . [SL Montevideo] motor development were not adequately passed down to Astromec" and that Boeing expected "Eaton to guide Astromec's design in a way that ensured problems with [the] original [SL Montevideo] motor would not be duplicated."  (DeJong 8/31/04 Dep. Tr. at Ex. 182.)  In mid-July 2001, problems with the motor design caused Fanelli to state that Astromec was in a "bad position" and did not

7

have "any chance" of meeting Eaton's requirements.  (Castle 8/20/04 Dep. Tr. Ex. 42.)

Castle recalls speaking to Fanelli about "the ceiling . . . falling."  (Id. at 270-71.)

In September 2001, a Monthly Engineering Activity Report found "[s]ignificant

design issues" which led to the postponement of a planned design review.  (SL

Montevideo App. 11-8 at EA 17496.)  Throughout that month, frequent communications

between Eaton and Astromec occurred.  On September 10, Eaton's Paauwe provided

Astromec with two or three pages of comments on its motor design drawings.  (See

Paauwe 9/17/04 Dep. Tr. at 86-90, Ex. 109.)  On September 14, Paauwe again emailed

pages of directions to Astromec's Fanelli on how to conduct a design analysis.  (See id. at

97-100, Ex. 108.)  On September 17, Fanelli advised Eaton's Blair that based on Eaton's

suggestions, Astromec was making changes to its motor.  (See id. at 102-03, Ex. 112.)

On September 17 and 19, Paauwe sent several pages of his engineering calculations to

Fanelli.  (See id. at 103-05, Exs. 112,113.)

On September 24, 2001, Boeing representatives expressed continued concerns that

Astromec was "[n]ot good at delivering high torque motors of this size."  (DeJong

8/31/04 Dep. Tr. Ex. 186.)  Later that day, Eaton's DeJong relayed those concerns to

Astromec's Castle during a four-and-a-half hour conference call.  (See id. at 160-61.)  On

September 25, Astromec's Fanelli adopted some suggestions that Eaton's Blair had made.

(See Blair 9/2/04 Dep. Tr. at 200-04, Exs. 115, 116, 214.)  On September 26, Eaton's

Paauwe sent another set of engineering calculations to Fanelli.  (See Paauwe 9/17/04 Dep.

Tr. at 121-22, Ex. 237.)  On October 1, 2001, Boeing reiterated its concerns about

Astromec's prior experience.  (<u>See</u> DeJong 8/31/04 Dep. Tr. at 186-88, Ex. 190.)  On

October 10 and 11, Eaton's Paauwe reviewed Fanelli's calculations, stating that they

"look[ed] good."  (<u>See</u> Paauwe 9/17/04 Dep. Tr. at 137-38, Exs. 120, 121.)  In November

2001, Paauwe reviewed Astromec's design, and Fanelli considered Paauwe as a

consultant who was called in to help on the motor.  (<u>See</u> Fanelli 7/1/04 Dep. Tr. at 190-

94, 263-66; DeJong 8/31/04 Dep. Tr. at 191-92.)

On March 13, 2002, Astromec's Fanelli believed that Astromec neither had the

time nor the money to make a motor for Eaton.  (<u>See</u> Castle 8/20/04 Dep. Tr. Ex. 60.)  At

some point, Eaton's engineer Jian Luo traveled from Eaton's Los Angeles facility to

Astromec's plant in Nevada to assist Fanelli.  (<u>See</u> <u>id.</u> at 142-43.)  On March 27, 2002,

Astromec issued a new timeline "to get [it] back on the development track" with a

completion date of May 2002.  (<u>Id.</u> at Ex. 69.)  It was also waiting for Luo's "analysis of

our design" to come back to "verify that we are on the right track."  (<u>Id.</u>)  On March 29,

2002, Eaton's DeJong emailed Fanelli explaining that Luo was "helping us to try [to]

work out of a tricky situation."  (Fanelli 7/2/04 Dep. Tr. Ex. 70.)

On April 3, 2002, SL Montevideo, which had previously decided to redesign its

-02 Motor pursuant to Eaton's request, informed Eaton that it would not be doing so.

(<u>See</u> Snell 4/12/05 Dep. Tr. at 17.)  On April 9, 2002, Eaton's DeJong told Astromec that

Eaton's General Manager Dave Bennett "had an axe to grind" with the "current" supplier,

and directed them to do "whatever it takes" to get the Astromec motor ready.  (DeJong

8/31/04 Dep. Tr. at 220-27, Ex. 194.)  At that time, Bennett also told DeJong to negotiate

a long-term agreement with Astromec because he did not want to "repeat" the SL Montevideo situation.  (See id. at 134-39, 227-28, Ex. 194.)  In May 2002, Eaton and Astromec executed a "Long Term Partnership Agreement" whereby Eaton could acquire the full design and manufacturing rights to the Astromec motor for $200,000 under certain conditions.  (See Gustafson 1/20/05 Dep. Tr. Ex. 258; Wynbelt 2/15/05 Dep. Tr. at 79-80.)

Communications between Eaton and Astromec personnel continued.  On June 24, 2002, Astromec's Fanelli confirmed that Eaton's Paauwe had offered to help with a particular problem.  (See Paauwe 9/17/04 Dep. Tr. Ex. 249.)  On August 26, 2002, Eaton's Blair addressed "design decisions" by providing three options to a certain problem.  (Blair 9/2/04 Dep. Tr. Ex. 215.)  On January 7 and 8, Fanelli, Blair, and Paauwe exchanged emails regarding another problem, to which Fanelli referred to the "expert guidance of [Paauwe]."  (Paauwe 9/07/04 Dep. Tr. Ex. 252.)

In all, Eaton's Paauwe recalls "almost constant[]" discussions between Eaton and Astromec.  (Paauwe 9/17/04 Dep. Tr. at 97-102.)  As he had for SL Montevideo's motors, Paauwe reviewed Astromec's mechanical design, participated in meetings with Astromec personnel, had access to the drawings of Astromec's motors, and prepared engineering analyses.  (See id. at 48-51.)  Eaton's Blair "participated in a whole series of technical phone calls"—"lots of phone calls"—with Astromec.  (Blair 9/2/04 Dep. Tr. at 177-79.)  For his part, Astromec's Castle cannot "begin to remember all of the times" he met with Eaton personnel.  (Castle 8/19/04 Dep. Tr. at 162-63.)

Eventually, Astromec produced a brushless direct-current motor that Eaton found acceptable.  According to SL Montevideo's Senior Designer, Dan Kjer, Astromec's motor is "substantially similar and in fact nearly identical to the Montevideo Motor."  (See Kjer Report at 3.)

## III.    The Current Litigation

SL Montevideo sued Eaton and Astromec alleging five claims for relief.  In November 2003, this Court dismissed three of those claims.  (See Doc. No. 21.)  Left standing were claims for misappropriation of trade secrets (as to Eaton and Astromec) and for breach of contract (as to Eaton).  Currently, there are eight matters before the court: three motions to exclude expert testimony; two objections to a magistrate judge's ruling; one motion to strike; and two summary judgment motions (one by Eaton and one by Astromec).  The Court will address each in turn.

## Analysis

## I.    Motions to Exclude Expert Testimony

### A.    Defendants' Motions to Exclude Report and Testimony of Plaintiff's Liability Experts William Houchens (Doc. No. 113) and Daniel Kjer (Doc. No. 122)

Eaton and Astromec seek to exclude the expert reports and testimony of SL Montevideo's two designated experts, William Houchens, who is SL Montevideo's Vice President of Quality Assurance, and Daniel Kjer, who is SL Montevideo's chief design engineer in charge of the brushless direct-current motor design group.  Eaton and Astromec raise several grounds in support of their Motions to Exclude.

First, they assert that Houchens's and Kjer's reports do not comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because neither witness wrote his report and counsel determined what opinions they would offer.  Rule 26(a)(2)(B) provides that the disclosure of expert testimony shall be accompanied "by a written report prepared and signed by the witness."  The advisory committee's note states that the rule

> does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed.  Nevertheless the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26 advisory committee's note.  While counsel here may have assisted in the preparation of the reports, upon consideration of the opinions that will be admissible at trial, see infra pp. 15-16, the Court cannot find that those opinions do not reflect the testimony to be given by the witnesses.

Second, Eaton and Astromec argue that Houchens's report further violates Rule 26(a)(2)(B) because he did not compile the list of supporting documents attached to his report and does not know whether the list is complete.  Rule 26(a)(2)(B) provides that the expert report shall contain "the data or other information considered by the witness in forming the opinions."  In this case, a list of data or other information reviewed by Houchens is attached to his report.  To the extent he did not consider something Eaton and Astromec find relevant, he is subject to cross-examination.  See Loudermill v. Dow Chemical Co., 863 F.2d 566, 570 (8th Cir. 1988) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is

up to the opposing party to examine the factual basis for the opinion in cross-

examination.").

Finally, Eaton and Astromec assert that Houchens's and Kjer's opinions are

inadmissible under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrill

Dow Pharm., Inc., 509 U.S. 579 (1993).  Both Houchens and Kjer purport to testify as to

the opinions numbered one through four below, and Kjer purports to also testify as to

opinion number five:

> 1.  The design of the Montevideo Motor, which Eaton incorporated into its
> 737 Stabilizer Trim Motor ("STM") and sold to The Boeing Company
> ("Boeing"), and the materials and processes [SL Montevideo] used to
> manufacture the Montevideo Motor, are unique in the aerospace industry,
> and constitute proprietary information and trade secrets of [SL
> Montevideo].
>
> 2.  During the design, development and production of the Montevideo
> Motor, Eaton came into the possession of a substantial amount of
> proprietary information and trade secrets of [SL Montevideo], including all
> of the design details of the Montevideo Motor.  By virtue of custom,
> practice and usage in the aerospace industry, and its own acknowledgment,
> Eaton knew that the design details of the Montevideo Motor were
> proprietary information and trade secrets of [SL Montevideo].
>
> 3.  When [SL Montevideo] ceased production of the Montevideo Motor,
> Eaton needed an alternate supplier for a [brushless direct-current motor] to
> include in the STM it was selling to Boeing, and engaged Astromec as the
> alternative motor designer and manufacturer, a company by background,
> experience and reputation not equipped to independently design and
> manufacture the [brushless direct-current motor].
>
> 4.  During the design, development and manufacture of various iterations of
> the Astromec Motor, Eaton transmitted to Astromec, and Astromec I
> believe utilized, proprietary information and trade secrets of [SL
> Montevideo], regarding the design, materials and manufacturing details of
> the Montevideo Motor, contrary to the Proprietary Information Agreement

13

between Eaton and [SL Montevideo] and Eaton's knowledge of the confidential status of that information.

5.  There are many different possible designs for a [brushless direct-current motor] which could be utilized in Eaton's STM.  The Astromec Motor, however, is substantially similar and in fact nearly identical to the Montevideo Motor.  The likelihood that any motor design engineer or company, particularly Astromec, would independently come up with a nearly identical [brushless direct-current motor] to the Montevideo Motor, incorporating keystone design elements of the Montevideo Motor, is highly unlikely, if not impossible.

(Kjer Report at 2-3.)

With respect to the proposed opinions and the objections thereto, the Court

concludes as follows[2]:

**Opinion 1**: The witnesses may testify that the SL Montevideo motor design,

materials, and processes are "unique."  They may also testify that the same constitutes

"proprietary information" to the extent they mean SL Montevideo owns the information.

See Websters Third New International Dictionary 1819 (1986).  However, they may not

testify that the information constitutes "trade secrets."  Although experts can opine on the

ultimate issues of fact, the Court "must guard against invading the province of the jury on

a question which the jury [is] entirely capable of answering without the benefit of . . .

expert opinion."  Robertson v. Norton Co., 148 F.3d 905, 908 (8th Cir. 1998) (citations

omitted); see Fed. R. Evid. 704(a).  In this case, the jury is entirely capable of

---

[2] Nothing in this Memorandum Opinion and Order precludes the witnesses from testifying to facts known to them.  While their proposed testimony is styled as expert opinion, much of it appears to be garden variety fact testimony.

determining for themselves whether SL Montevideo's motor design, materials, and processes constitute trade secrets.

**Opinion 2**: The witnesses may testify to what information Eaton possessed, but they may not testify that the information constitutes "trade secrets" for the reasons expressed above.  See Robertson, 148 F.3d at 908.  The witnesses may also testify as to the custom and usage of the industry, but they may not testify that Eaton "knew that the design details of the Montevideo Motor were proprietary information and trade secrets of [SL Montevideo]" for the reasons expressed above.  See Robertson, 148 F.3d at 908.

**Opinion 3**: The witnesses may testify as to this entire opinion.

**Opinion 4**: The witnesses may testify as to their knowledge of what information Eaton transmitted to Astromec and what information Astromec utilized regarding the design, materials, and manufacturing details of the Montevideo Motor.  They may not testify that the information constitutes "trade secrets" or that the information was disclosed contrary to the Agreement.  See Robertson, 148 F.3d at 908.

**Opinion 5**: Witness Kjer may testify that there are many different possible designs for a brushless direct-current motor that could be utilized in Eaton's STM, and that Astromec's motor is "substantially similar and in fact nearly identical to the Montevideo Motor."  However, he may not testify that the "likelihood that any motor design engineer or company, particularly Astromec, would independently come up with a nearly identical [brushless direct-current motor] to the Montevideo Motor, incorporating keystone design

15

elements of the Montevideo Motor, is highly unlikely, if not impossible" because the jury

is entirely capable of determining this for themselves.  See <u>Robertson</u>, 148 F.3d at 908.

**B.     Plaintiff's Motion to Exclude Trial Testimony By Defendants' Liability Expert Andrew Neuhalfen Ph.D. (Doc. No. 132)**

SL Montevideo seeks to exclude the trial testimony and expert report of Eaton's

and Astromec's designated expert witness, Andrew Neuhalfen.  It first asserts that

Neuhalfen lacks the necessary qualifications to be deemed an expert in the design,

development process, or characteristics of brushless direct-current motors.  Rule 702 of

the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized

knowledge will assist the trier of fact . . . a witness qualified as an expert by knowledge,

skill, experience, training, or education, may testify" in the form of an opinion.  The

Court finds Neuhalfen qualified: Neuhalfen earned a B.S. in electrical engineering and a

Ph.D. in materials science and engineering; is licensed as a professional engineer; worked

five years as a development engineer, six years as an engineering manager, and seven

years managing electrical-related accident investigations; belongs to several engineering-

related associations; published several engineering-related articles; holds eight patents;

and has testified in twelve trials.  (<u>See</u> Am. Resp. Mem. in Opp'n Ex. B (Neuhalfen

4/1/05 Report).)

Next, SL Montevideo argues that Neuhalfen's conclusions are unreliable and

untrustworthy because they are not based on empirically-verifiable scientific knowledge,

and that Neuhalfen's reasoning and methodology lacked scientific validity.  These

16

arguments require an examination of Neuhalfen's conclusions.  According to Eaton and

Astromec, Neuhalfen will opine, presumably in their favor, regarding the following:

1.  Whether motor design features claimed by [SL Montevideo] to be trade
secrets are, indeed, novel developments in brushless [direct-current] motor
design (versus having been specified by Eaton or previously known in the
industry);

2.  Whether motor design features claimed by [SL Montevideo] to be trade
secrets are present in the Astromec motor;

3.  Whether [SL Montevideo's] and Astromec's motor designs are
substantially similar, in light of the Eaton specifications governing both
motors;

4.  Whether Astromec and Walter Fanelli were qualified by background,
education, training, and experience to design the Astromec motor;

5.  Whether Astromec's well documented development process was
performed independently of [SL Montevideo's] alleged trade secrets; and

6.  Whether, in light of all the evidence in this case, Eaton and/or Astromec
misappropriated [SL Montevideo's] alleged trade secrets.

(Am. Resp. Mem. in Opp'n at 10.)

With respect to the proposed opinions and the objections thereto, the Court

concludes as follows[3]:

**Opinion 1**: The witness may testify as to this entire opinion.  (Neuhalfen's opinion

as to whether the design is "novel" is similar to Houchens's and Kjer's "Opinion 1.")

---

[3] As said above with respect to Houchens and Kjer, nothing in this Memorandum
Opinion and Order precludes Neuhalfen from testifying to facts known to him.  While his
proposed testimony is styled as expert opinion, much of it appears to be garden variety
fact testimony.

**Opinion 2**: The witness may testify as to this entire opinion.

**Opinion 3**: The witness may testify as to this entire opinion.  (Neuhalfen's opinion as to whether SL Montevideo's and Astromec's motor designs are "substantially similar" is similar to Kjer's "Opinion 5.")

**Opinion 4**: The witness may testify as to this entire opinion.  (Neuhalfen's opinion as to whether Astromec and Fanelli "were qualified" is similar to Houchens's and Kjer's "Opinion 3.")

**Opinion 5**: The witness may not testify as to "[w]hether Astromec's well documented development process was performed independently."  In this case, the jury is entirely capable of determining for themselves whether Astromec's development process was "well documented" and whether it was "performed independently."  See Robertson, 148 F.3d at 908.

**Opinion 6**: The witness may not testify as to "[w]hether . . . Eaton or Astromec misappropriated [SL Montevideo's] alleged trade secrets."  Again, as with Houchens's and Kjer's similar proposed "Opinion 4," the jury is entirely capable of determining for themselves whether Eaton or Astromec misappropriated SL Montevideo's alleged trade secrets.  See Robertson, 148 F.3d at 908.

## II.   Objections to Magistrate Judge Noel's June 20, 2005 Ruling (Doc. Nos. 206, 211)[4]

---

[4] The Motions are entitled: (1) Plaintiff's Objection and Motion to Reverse, In Part, Magistrate Judge Noel's June 20, 2005 Ruling (Doc. No. 206); and (2) Defendants' Objections and Motion to Reverse, In Part, Magistrate Judge Noel's June 20, 2005 Order

The parties have filed objections to Magistrate Judge Noel's June 20, 2005 ruling. Magistrate Judge Noel denied SL Montevideo's request for sanctions against Eaton and Astromec for allegedly delaying the deposition of Andrew Neuhalfen.[5]  SL Montevideo has objected to the ruling and seeks an order barring Neuhalfen's testimony and awarding attorneys fees and costs.

Magistrate Judge Noel also denied Eaton's and Astromec's motion to extend the disclosure deadline for their damages expert's report (the Vondra Supplemental Report) by fourteen days, or to strike SL Montevideo's damages expert's report (the Lapidus Supplemental Report) as untimely.  Magistrate Judge Noel stated the following on the record regarding the motion:

> To the extent the–I think I've already ruled on the motion to extend the service deadline.  The parties have apparently reached some agreement with respect to that, and again, I express no opinion on that.  If the parties are happy, I'm happy as long as the Court is not enlisted in any way as agreeing to a change in the schedule that the Court has already told you twice will not be changed.

(Defs.' Objection & Mem. in Supp. Ex. B.)  Eaton and Astromec have objected to this ruling and seek an order either extending the deadline for their damages expert's report, or striking SL Montevideo's damages expert's report as untimely.

_____

(Doc. No. 211).

[5] Ultimately, SL Montevideo deposed Neuhalfen on June 23, 2005, but it had sought to depose him in April or May.

Local Rule 72.2(a) governs the review of magistrate judge rulings on nondispositive matters.  The rule provides that the district judge shall consider objections to a magistrate judge's order and shall modify or set aside any portion of that order found to be "clearly erroneous or contrary to law."  Upon consideration of the June 20, 2005 Order and the objections thereto, the undersigned concludes that Magistrate Judge Noel's ruling is neither erroneous nor contrary to law.  Accordingly, the objections will be overruled and the order affirmed.

**III.    Defendants' Motion to Strike Plaintiff's Summary Judgment Pleadings Filed in Violation of Local Rule 7.1 (Doc. No. 258)**

For the reasons set forth on the record at the July 28, 2005 hearing, the Motion to Strike will be denied.

**IV.    Motions For Summary Judgment (Doc. Nos. 139, 169)**

Turning now to the most consequential motions, Eaton and Astromec have moved for summary judgment.  With respect to SL Montevideo's misappropriation of trade secrets claim, Eaton and Astromec argue that SL Montevideo has not produced sufficient evidence of a trade secret or its misappropriation.  With respect to SL Montevideo's breach of contract claim, Eaton argues that SL Montevideo has not established a material breach of the Proprietary Information Agreement.  Viewing the evidence in a light most favorable to SL Montevideo, the Court concludes that genuine issues of material fact abound as to both claims and it will deny the summary judgment motions for the reasons set forth below.

## A.     Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B.     Misappropriation of Trade Secrets

SL Montevideo alleges that Eaton and Astromec misappropriated its trade secrets. The Minnesota Uniform Trade Secrets Act ("MUTSA") prohibits the improper acquisition, use, or disclosure of trade secrets.  See Minn. Stat. §§ 325C.01-08; Fox Sports Net North, LLC v. Minnesota Twins Partnership, 319 F.3d 329, 335 (8th Cir. 2003).  In a suit for misappropriation of trade secrets, the plaintiff must specify what

information it seeks to protect.  Fox Sports Net North, 319 F.3d at 335; see Electro-Craft

Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 898 (Minn. 1983).  A trade secret is

information that: (1) is not generally known or readily ascertainable; (2) has value as a

result of its secrecy; and (3) is the subject of reasonable efforts under the circumstances to

protect its secrecy.  See Minn. Stat. § 325C.01, subd. 5; Wyeth v. Natural Biologics, Inc.,

395 F.3d 897, 899 (8th Cir. 2005).

### 1.    Specified Information

Eaton and Astromec argue that SL Montevideo has failed to specify the

information it considers to be trade secrets.  (See Astromec Mem. in Supp. at 5-19.)  SL

Montevideo responds that the entire design of the -02 Motor is a trade secret.[6]  (See SL

Montevideo Mem. in Opp'n to Eaton at 2, 3, 30; SL Montevideo Mem. in Opp'n to

Astromec at 15-16; Houchens 1/6/05 Dep. Tr. at 6-9.)  In addition, SL Montevideo states

that certain individual components are trade secrets: the lamination geometry, magnetics,

copper winding size and number of turns per lamination pole, use of certain lightweight

materials, and "tradeoffs that allowed the motor to meet the extremely low breakaway

torque while producing output torque under power."  (See SL Montevideo Mem. in

---

[6] SL Montevideo does not claim that the entire design of the Size 18 Motor is a
trade secret.  (See Houchens 1/6/05 Dep. Tr. at 6-9.)

Opp'n to Astromec at 15 (citing Kjer Report).)  The Court finds that SL Montevideo has

sufficiently specified the information it seeks to protect.[7]

## 2.    Not Generally Known or Readily Ascertainable

Eaton and Astromec contend that the overall design of the -02 Motor is not

sufficiently novel to constitute a trade secret.  (See Astromec Mem. in Supp. at 8-13.)

Novelty goes to the issue of whether the information is generally known or readily

ascertainable.  See Electro-Craft, 332 N.W.2d at 899.  Although novelty is not a

requirement for trade secrets to the same extent as it is for patents, some novelty is

required.  See id.  In certain cases, a novel or unique combination of elements may

constitute a trade secret.  See id.; Strategic Directions Group, Inc.  v. Bristol-Myers

Squibb Co., 293 F.3d 1062, 1065 (8th Cir. 2002).  However, "mere variations on widely

used [information] cannot be trade secrets."  Electro-Craft, 332 N.W.2d at 899.  The

Court finds that genuine issues of material fact exist as to whether SL Montevideo's -02

Motor design is novel.  "The trier of fact, especially in very technical cases such as the

present case, should be given the discretion to decide the difficult issue of whether

_____

[7] SL Montevideo has sufficiently identified its trade secrets as the entire design of
the -02 Motor and several individual components.  From this point forward, however, the
Court's analysis will focus solely on the entire design of the -02 Motor.  With respect to
the individual components, the parties dispute whether any meet the definition of a trade
secret under the MUTSA.  Significant in this dispute are apparent admissions by SL
Montevideo personnel that certain components are not trade secrets.  Any challenge to the
individual components as trade secrets can be the subject of motions in limine.

information is generally known or readily ascertainable." Id. at 900 n.11; see Northwest Airlines v. American Airlines, 853 F. Supp. 1110, 1114 (D. Minn. 1994).

### 3.     Value as a Result of Secrecy

Next, Eaton and Astromec assert that there is no economic value in SL Montevideo's alleged trade secrets because SL Montevideo turned down business from Eaton, and Astromec is not profiting from its motor.  (See Astromec Mem. in Supp. at 19 n.5.)  SL Montevideo responds that Astromec is profiting, that Astromec's motor is worth at least $200,000 based on the agreement it has with Eaton, and that there is a replacement market in which Astromec can sell its motors.  (See SL Montevideo Mem. in Opp'n to Astromec at 26.)

This element of the MUTSA carries forward the common law requirement that a trade secret must be of some competitive advantage.  See Electro-Craft, 332 N.W.2d at 900.  The statute requires that a trade secret "derives independent economic value, actual or potential, from not being generally known . . . and not being readily ascertainable." Minn. Stat. § 325C.01, subd. 5.  "If an outsider would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable." Electro-Craft, 332 N.W.2d at 900.  The Court finds that whether SL Montevideo's alleged trade secrets derive value from not being known or readily ascertainable is an issue for the trier of fact to resolve.  See Yarian v. Rainbow Foods Group, 2003 WL 24027721, at *5 (D. Minn. Mar. 18, 2003).

### 4.     Reasonable Efforts to Protect Secrecy

Eaton and Astromec also argue that SL Montevideo did not make reasonable efforts to protect the secrecy of its alleged trade secrets. (See Astromec Mem. in Supp. at 19-22.) Specifically, Eaton and Astromec contend SL Montevideo unreasonably: (1) disclosed its trade secrets to Eaton, Boeing, and suppliers without executing confidentiality agreements beforehand; (2) executed the Agreement with Eaton to only protect its Proprietary Information for five years; (3) failed to request the return of its Proprietary Information after its relationship with Eaton terminated; (4) failed to restrict access to its motors after they were sold to Eaton; (5) publicly disclosed one component of its alleged trade secrets (a lamination) during this lawsuit; and (6) relied solely on stamping its propriety documents as "confidential." (Id.) SL Montevideo responds that it made reasonable efforts to protect the secrecy of its trade secrets by placing "confidential" or "proprietary" stamps on its documents and by executing the Agreement with Eaton. (See SL Montevideo Mem. in Opp'n to Eaton at 32; SL Montevideo Mem. in Opp'n to Astromec at 27-30.) It also contends that Eaton personnel admit that its motor design was proprietary. (See id.)

Absolute secrecy of trade secrets is not required by the MUTSA. See Natural Biologics, 395 F.3d at 900. "Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets." Surgidev Corp. v. Eye Tech., Inc., 828 F.2d 452, 455 (8th Cir. 1987). Furthermore:

> The existence of a trade secret is not negated merely because [a] person has acquired the trade secret without express or specific notice that it is a trade secret if, under the circumstances, [that] person knows or has reason to

25

> know that the owner intends or expects the secrecy of the type of
> information comprising the trade secret be maintained.

Minn. Stat. § 325C.01, subd. 5.  Considering the totality of the circumstances, the Court

finds that genuine issues of material fact exist as to whether SL Montevideo's

confidentiality measures were reasonable under the circumstances, and whether Eaton

and/or Astromec personnel knew or had reason to know that the information was to

remain secret.  See Northwest Airlines, 853 F. Supp. at 1115-16.

### 5. Misappropriation

Finally, Eaton and Astromec argue that SL Montevideo has not established

misappropriation.  The MUTSA provides the following definition of "misappropriation":

> "Misappropriation" means:
> (i) acquisition of a trade secret of another by a person who knows or has
> reason to know that the trade secret was acquired by improper means; or
> (ii) disclosure or use of a trade secret of another without express or implied
> consent by a person who
>> (A) used improper means to acquire knowledge of the trade secret;
>> or
>> (B) at the time of disclosure or use, knew or had reason to know that
>> the discloser's or user's knowledge of the trade secret was
>>> (I) derived from or through a person who had utilized
>>> improper means to acquire it;
>>> (II) acquired under circumstances giving rise to a duty to
>>> maintain its secrecy or limit its use; or
>>> (III) derived from or through a person who owed a duty to the
>>> person seeking relief to maintain its secrecy or limit its use.

Minn. Stat. § 325C.01, subd. 3.  "Improper means" includes a breach of a duty to

maintain secrecy.  Id. § 325C.01, subd. 2.  "In some instances, the [trade] secret is so

unique that the emergence of a similar, slightly altered product gives rise to an inference

26

of misappropriation." <u>Natural Biologics</u>, 395 F.3d at 900 (citing <u>Pioneer Hi-Bred Int'l v.</u>

<u>Holden Found. Seeds, Inc.</u>, 35 F.3d 1226, 1239-40 (8th Cir. 1994) (interpreting similar

Iowa trade secret law)).

Eaton and Astromec argue that SL Montevideo cannot demonstrate that they

misappropriated its alleged trade secrets because (1) there is no direct evidence of

misappropriation; (2) SL Montevideo cannot show that Astromec had access to the trade

secrets; (3) SL Montevideo cannot show that Astromec's motor is substantially similar;

(4) SL Montevideo cannot show that Astromec's development process was unusually

quick or inexpensive; (5) Astromec developed its motor independent of SL Montevideo's

trade secrets; and (6) assuming Astromec obtained SL Montevideo's trade secrets,

Astromec did not know that the information were trade secrets.[8]  (<u>See</u> Astromec Mem. in

Supp. at 23-32, incorporated by reference by Eaton Mem. in Supp. at 10-12.)

SL Montevideo responds that Eaton disclosed and used the trade secrets without

consent while knowing the trade secrets were acquired under circumstances giving rise to

a duty to maintain their secrecy.  (<u>See</u> SL Montevideo Mem. in Opp'n to Eaton at 32-33.)

It further responds that Astromec acquired the trade secrets knowing or having reason to

know that it was acquiring them by improper means though Eaton, and that Astromec

used the trade secrets without consent knowing or having reason to know that the trade

---

[8] Astromec also alleges that SL Montevideo has no damages claim against it.  (<u>See</u> Astromec Mem. in Supp. at 3-5.)  SL Montevideo responds that Astromec has been unjustly enriched in various ways.  (<u>See</u> SL Montevideo Mem. in Opp'n to Astromec at 32-33.)  The Court finds that the damages question is better left to the trier of fact.

secrets were derived through Eaton who owed a duty to maintain the secrecy of the trade secrets.  (See SL Montevideo Mem. in Opp'n to Astromec at 31-32.)

Eaton and Astromec launch a barrage of replies.  Eaton replies that (1) there is no direct evidence of misappropriation; (2) none of its communications with Astromec revealed trade secrets regarding SL Montevideo's lamination design; (3) none of its alleged design direction to Astromec conveyed SL Montevideo's trade secrets; (4) it did not convey trade secrets by identifying SL Montevideo's motor design problems; (5) its purchasing and engineering department documents do not demonstrate misappropriation; (6) SL Montevideo merely speculates that Eaton misappropriated its trade secrets; and (7) SL Montevideo has not offered evidence that the motors are substantially similar beyond what was specified by Eaton.  (See Eaton Reply Mem. in Supp. at 6-21.)  For its part, Astromec adopts Eaton's replies and adds that SL Montevideo has not established that Astromec (8) knew or had reason to know that the information it received from Eaton were trade secrets; (9) lacked the capability to design a motor independently of the alleged trade secrets; and (10) had access to the alleged trade secrets.  (See Astromec Reply Mem. in Supp. at 11-15.)

Considering the arguments, and viewing the evidence in a light most favorable to SL Montevideo, the Court finds that genuine issues of material fact exist as to whether Eaton and Astromec misappropriated SL Montevideo's alleged trade secrets.  For example, there is conflicting evidence as to whether the alleged trade secrets are unique and whether the brushless direct-current motors are similar.  SL Montevideo's experts

28

will testify that they are unique and that the motors are similar, while Eaton's and

Astromec's expert will presumably testify that the trade secrets are not unique and the

motors are not similar.  These disputes are material to the issue of misappropriation.  The

Eighth Circuit has recently held that "[i]n some instances, the [trade] secret is so unique

that the emergence of a similar, slightly altered product gives rise to an inference of

misappropriation."  Natural Biologics, 395 F.3d at 900 (citation and internal quotations

omitted).  For another example, there is conflicting evidence as to Astromec's ability to

develop a brushless direct-current motor and its record of how it ultimately produced one.

These facts are also material to the issue of misappropriation.  See id. (considering such

factors in finding misappropriation).  Accordingly, the Court will deny the summary

judgment motions with respect to the misappropriation of trade secrets claim.[9]

### C.   Breach of the Agreement

SL Montevideo also alleges that Eaton breached the Proprietary Information

Agreement.  To prevail on its breach of contract claim, SL Montevideo must show (1) the

formation of a contract; (2) its performance of any conditions precedent; (3) a material

breach of the contract by Eaton; and (4) damages.  Parkhill v. Minnesota Mut. Life Ins.

Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000); see Sip-Top, Inc. v. Ekco Group, Inc., 86

F.3d 827, 830 (8th Cir. 1996) (applying Minnesota law).  "Contract interpretation is a

---

[9] Given this result, Eaton and Astromec are not entitled to summary judgment on
their counterclaims for attorneys fees asserted under Minn. Stat. § 325C.04 based on a
claim of misappropriation made in bad faith.  (See Eaton Mem. in Supp. at 23-26.)

question of law . . . [and] the primary goal of contract interpretation is to determine and enforce the intent of the parties." <u>Travertine Corp. v. Lexington-Silverwood</u>, 683 N.W.2d 267, 271 (Minn. 2004) (citations omitted).  "[W]hen a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction."  <u>Id.</u> (citations omitted).

Eaton argues that SL Montevideo cannot demonstrate a material breach of the Agreement.  It contends that the unambiguous Agreement applies only to certain documents and there is no evidence that it gave Astromec any of those documents.  (<u>See</u> Eaton Mem. in Supp. at 2, 15-17, 22 n.9.)  It is Eaton's position that the Agreement restricts only the disclosure of documents, not the disclosure of information contained in those documents.  (<u>See</u> <u>id.</u>)  When asked to clarify its position at the hearing, Eaton asserted that the Agreement did not prevent it from reading information from a marked document over the phone to Astromec; rather, the Agreement only prevented it from physically giving documents to Astromec.

The Court rejects Eaton's argument.  The Agreement is entitled "Proprietary Information Agreement" and provides that each party "shall keep in confidence and not disclose to any person . . . any of the other party's Proprietary Information."  (Agreement ¶ 3.)  It defines "Proprietary Information" as "information" which is "recorded information, regardless of the form or method of recording . . . which has been marked as proprietary (or with words of similar meaning) by a stamp or other written or recorded identification. . . ."  (Agreement ¶ 2.)  Thus, the Agreement protects "information" which

30

is "recorded" and identified as proprietary.  Eaton seems to conflate the "information" with the "recording" and treat them as one.  But, in the Court's view, these are intended to be separate concepts.  "Information" exists without being "recorded."  Although "information" must be "recorded" to be protected from disclosure under the Agreement, it does not follow that the recording is protected while the information is not.  Eaton's construction would make the Agreement a dead-letter, as neither side would be prevented from reading the contents of a "proprietary" document to another person.  This cannot be what was intended, and Eaton's strained construction does not reflect reality.

Eaton also argues that it is entitled to summary judgment because SL Montevideo cannot show that the information was (1) reduced to a recording; (2) stamped; (3) disclosed to the proper people; (4) not in the public domain; (5) not otherwise known by Eaton; (6) not disclosed to others; and (7) not independently developed.  (See Eaton Mem. in Supp. at 17-23.)  Considering the evidence in a light most favorable to SL Montevideo, the Court finds that genuine issues of material fact exist on these issues.  It is for the finder of fact to determine what information, if any, was disclosed to Astromec, and whether such information constituted "Proprietary Information" as defined under the Agreement.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Defendants' Motion to Exclude Report and Testimony of Plaintiff's Liability Expert William Houchens (Doc. No. 113) is **GRANTED IN PART** and **DENIED IN PART** as noted above;

2. Defendants' Motion to Exclude Report and Testimony of Plaintiff's Liability Expert Daniel Kjer (Doc. No. 122) is **GRANTED IN PART** and **DENIED IN PART** as noted above;

3. Plaintiff's Motion to Exclude Trial Testimony By Defendants' Liability Expert Andrew Neuhalfen Ph.D. (Doc. No. 132) is **GRANTED IN PART** and **DENIED IN PART** as noted above;

4. Plaintiff's Objection and Motion to Reverse, In Part, Magistrate Judge Noel's June 20, 2005 Ruling (Doc. No. 206) is **DENIED**;

5. Defendants' Objections and Motion to Reverse, In Part, Magistrate Judge Noel's June 20, 2005 Order (Doc. No. 211) is **DENIED**;

6. Defendants' Motion to Strike Plaintiff's Summary Judgment Pleadings Filed in Violation of Local Rule 7.1 (Doc. No. 258) is **DENIED** for the reasons set forth on the record at the July 28, 2005 hearing;

7.      Defendant Astromec's Motion for Summary Judgment (Doc. No. 139) is

**DENIED**; and

8.      Defendant Eaton's Motion for Summary Judgment (Doc. No. 169) is

**DENIED**.


Dated:  August 11, 2005                          s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge