# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

SL Montevideo Technology, Inc.,

Plaintiff,

Civ. No. 03-3302 (RHK/FLN)
**MEMORANDUM OPINION
AND ORDER**

v.

Eaton Aerospace, LLC,
and Astromec, Inc.,

Defendants.

Mark H. Verwys, Plunkett and Cooney, PC, Grand Rapids, Michigan.

Michael H. King, Elizabeth M. Bradshaw, and Bradley I. Schecter, LeBoeuf, Lamb, Greene & MacRae, LLP, Chicago, Illinois, for Defendants.

## Introduction

Before the Court is Defendants' Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a).[1]  The parties have presented almost two weeks of testimony on SL Montevideo's claims of misappropriation of trade secrets under the Minnesota Uniform Trade Secret Act, Minn. Stat. § 325C.01 ("MUTSA"), and breach of contract.  SL Montevideo claims that the design of its -01 and -02 motors (collectively, the "Montevideo motor") as a whole is proprietary and entitled to trade secret status, and that

---

[1]The Motion was made at the conclusion of SL Montevideo's case-in-chief, taken under advisement by the Court, and then renewed at the close of all the evidence.

certain individual components of its motor are proprietary and entitled to trade secret status—specifically: (1) the lamination, including the 12 slots; (2) the dimensions/configurations of the magnets; (3) the geometry of the magnets; (4) the windings design; and (5) the rotor inertia.  For the reasons set forth below, the Court will grant Defendants' Motion.

## Standard of Decision

Judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1).  Granting a motion for judgment as a matter of law "is appropriate where the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict." Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (internal quotation omitted).  The evidence is viewed "in the light most favorable to the nonmoving party." Id. (citation omitted).

## Analysis

### A.    Misappropriation of Trade Secrets

To qualify as a trade secret under the MUTSA, (1) the information must not be generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy.  Strategic Directions Group v. Bristol-Myers Squibb, 293 F.3d 1062, 1065 (8th Cir. 2002).  To succeed on a trade secret claim, a plaintiff must first define its

alleged trade secrets with sufficient specificity.  <u>Jostens, Inc. v. National Computer Sys.</u>,
318 N.W.2d 691, 699 (Minn. 1982).  Thus, where a plaintiff "assert[s] a trade secret
resides in some combination of otherwise known data [here—component parts of the
motor], . . . the combination itself must be delineated with some particularity in
establishing its trade secret status."  <u>Id.</u>; <u>see also</u> <u>Electro-Craft Corp. v. Controlled Motion,
Inc.</u>, 332 N.W.2d 890, 898 (Minn. 1983).

        Defendants argue that SL Montevideo has failed to introduce "<u>any</u> evidence at trial
specifying its claimed trade secrets" (Mem. in Supp. at 3 (emphasis in original)); that SL
Montevideo "introduced <u>no</u> evidence at trial identifying a <u>single dimension</u> or any
component, sub-assembly, or interaction between sub-assemblies that it is claiming as a
trade secret" (<u>id.</u> at 3-4 (emphasis in original)); and that, absent this evidence, "it is
impossible for any reasonable jury to find that Defendants misappropriated any trade
secrets" (<u>id.</u>).

        SL Montevideo responds that testimony it presented by one of its expert
witnesses—Dan Kjer (who also designed the Montevideo motor)—did establish the
"specific nature of [its] trade secrets."  (Mem. in Opp'n at 2.)  It points to four of its own
exhibits as support for the specificity in the record: (1) Exhibit 485—Eaton's first
specification for the -01 motor; (2) Exhibit 84—Eaton's second specification for the -01
motor; (3) Exhibit 472—Eaton's specification for the -02 motor; and (4) Exhibit
27—Eaton's specification for what ended up being the Astromec motor.  Certain of the
performance characteristics listed in Eaton's various "specs" for the Brushless DC Motor

at issue in this case ("BDCM") were derived from Montevideo's motor.  At trial, SL

Montevideo pointed to the following performance characteristics or values that were

derived from the Montevideo motor and contained in the Eaton spec given to Astromec:

weight, rotor inertia, breakaway torque, torque constant, back-EMF constant, and resistance

(phase to phase).  These performance characteristics are not design drawings; nor do they

define or delineate the physical dimensions (beyond the weight) of the motor or any of its

component parts.  Rather, the performance characteristics appear to be values that

represent certain aspects of the motor's performance.[2]

At trial and oral arguments on the instant Motion, SL Montevideo advanced the

theory that the performance characteristics listed above were so integral to the design of

the Montevideo motor, that Eaton's action in providing those numbers to Astromec

virtually guaranteed that the Astromec and Montevideo motors would be the same.  Kjer

testified on that topic as follows:

> the internal part of [the Astromec] motor that is important to the function of
> that motor are basically the same, have similar, if not in [a] lot of cases
> identical.  They have to be because [Eaton] specified my design parameters.
> And how can you get to my design parameters without being very close to
> what my design is?  You cannot do that.

---

[2]For example, the rotor inertia "is the ability of the motor to rotate and accelerate
and back driven through the system" (Trial Tr. at 258); the breakaway torque, measured in
inch ounces, cannot be determined until the motor is built and designed (id. at 258-59); the
torque constant, measured in inch ounces per amp, is "how much current the motor is going
to draw from whatever torque you are operating at" (id. at 260); and the back-EMF constant
"is a voltage generated by the motor if it's not turning under its own power," and/or "is
derived and can be directly related to the . . . torque constant" (id. at 261-62).

(Trial Tr. at 320.)  Upon questioning from the Court at oral argument on the instant Motion,

counsel for SL Montevideo contended that any motor with the performance characteristics

specified in Eaton's specs would constitute a misappropriation of SL Montevideo's trade

secrets, regardless of whether the underlined designs of the motors were the same.

While SL Montevideo did offer Eaton's specs as exhibits in its case-in-chief (as

discussed above), it did not introduce any exhibits to delineate the physical design

properties of its motor or the component parts of its motor.  And while it designated its

"green package"—the document that contains Kjer's entire design for the Montevideo

motor—on its exhibit list, it did not attempt to offer the green package into evidence during

Kjer's testimony (despite some discussion of the green package during that testimony), nor

was Kjer directed to any specific drawings in the green package during his testimony.  In

fact, prior to SL Montevideo resting, the Court asked counsel for SL Montevideo directly

whether he planned to offer the "green package" as an exhibit and he said that he did not.[3]

---

[3]Subsequent to the initial hearing on the instant Motion at which Court expressed
some scepticism regarding the ability of SL Montevideo to identify its trade secrets with
adequate specificity, and two days into Defendants' presentation of evidence, counsel for
SL Montevideo moved to reopen his proofs in order to offer the green package, along with
two other documents, as exhibits.  He did not offer the Court any explanation, other than
oversight on his part, for his withholding of the documents during his case-in-chief.  Having
determined that counsel's assertion of "oversight" was not credible—rather, that counsel's
initial decision to keep the documents out of evidence during his case-in-chief was a
deliberate and strategic one—the Court concluded that he lacked good cause for reopening
his proofs and denied the Motion.  Again, after the close of Defendants' case, counsel for
SL Montevideo attempted to offer the documents in rebuttal, without calling a witness to
testify about, and/or lay foundation for, the documents.  Defendants objected to the
documents being offered in rebuttal, and the Court sustained the objection.  In addition, the
Court notes that it has serious doubts as to the value, under Federal Rule of Evidence 401,

The Minnesota Supreme Court has made clear that "[s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status." Jostens, Inc., 318 N.W.2d at 699 (citation omitted).  In a case involving brushless motors (as this one does), the court held that the plaintiff failed to establish a trade secret for lack of specificity where it "did [not] even introduce the dimensions, tolerances, etc. of the brushless motor into evidence."  Electro-Craft Corp., 332 N.W.2d at 898; see also VFD Consulting, Inc. v. 21st Servs., — F. Supp. 2d —, 2006 WL 680554, at *9 (N.D. Cal. Mar. 13, 2006) (applying Minnesota law, and noting that the plaintiff had not established a trade secret where it "[had] not identified, with any particularity, how [its designer] organized or combined the materials in a manner that rises to the level of a legally protectable trade secret").

Here, SL Montevideo has not presented any testimony or exhibits establishing with particularity what its claimed trade secrets are.  It has not identified the dimensions of the "guts"[4] of the Montevideo motor or how the specific component parts of the Montevideo motor are combined in the "guts" to constitute a trade secret when taken as a whole.  See Jostens, 318 N.W.2d at 699.  Further, despite being on notice of Defendants' Motion, SL Montevideo failed to introduce into evidence (through Defendants' witnesses or through a

_____

of allowing such documents into evidence without any corresponding detailed testimony concerning the meaning or content of those documents.

[4]Kjer referred to the "guts" of the Montevideo motor as proprietary, and testified that the "guts" of the Montevideo and Astromec motors are "the same."  (Trial Tr. at 320.)

rebuttal witness) its design drawings, detailed testimony, or any other evidence that specifies what its claimed trade secrets are. The only documents in evidence that contain any dimensions are Eaton's own specs.

For example, in response to the instant Motion, SL Montevideo asserts that Kjer testified that the "width, thickness, and overall geometry of the samarium cobalt magnets . . . is co-designed with the lamination geometry to produce an overall magnetic performance." (Mem. in Opp'n at 3.) But Kjer did not testify as to the width or thickness of the magnets. Nor did Kjer testify as to the dimensions of the Montevideo motor generally, or to the combination of components with sufficient particularity to identify how the components combine to establish SL Montevideo's trade secret in the motor as a whole.[5]

Kjer testified numerous times to the effect that "[w]hat makes the [Montevideo] motor unique and novel is the combination of all of the inclusive parts and the design configuration," (Trial Tr. at 282), that "one thing does not constitute a design," (id. at 226), and that "you can't look at the design in one specific area, you have to look at them all" (id.

---

[5]The Court notes that the lack of testimony from Kjer regarding the specifics of the design and dimensions of the Montevideo motor does not appear to result from a lack of knowledge on his part. Kjer designed the Montevideo motor, and his testimony demonstrated that he has extensive motor design experience and expertise. He was capable of testifying to the specifics of his motor and he had the green package with him when he took the stand, which contained the entire design for the Montevideo motor. But that testimony was not elicited from him. Furthermore, despite having been apprised of the Court's concerns regarding the lack of specificity in the record, SL Montevideo did not elect to re-call Kjer, or any other witness, in rebuttal.

at 227).  But he was never asked to testify in any detail regarding the specifics of <u>how</u> the

Montevideo motor, as a whole, is unique and novel such that it would be entitled to trade

secret status.

In addition, the performance characteristics that SL Montevideo now so heavily

relies upon do not delineate its trade secrets with specificity.  The performance

characteristics of weight, breakaway torque, torque constant, back-EMF constant, and

resistance (phase-to-phase) are <u>not</u> themselves claimed as trade secrets.  SL Montevideo

has always claimed the <u>design</u> of its motor as a whole, and certain of its component parts,

as trade secrets.  While Kjer testified that the performance characteristics cannot be

produced from a motor that is not "very close to what [his] design is," (Trial Tr. at 320), this

testimony simply <u>does not</u> identify with <u>any</u> specificity or particularity <u>what that design is</u>.[6]

Therefore, the Court determines that SL Montevideo has not presented evidence from

which a reasonable jury could conclude that the Montevideo motor, as a whole, has been

identified with sufficient specificity to constitute a trade secret under Minnesota law.

With respect to the five individual components of the Montevideo motor, again SL

_____

[6]SL Montevideo's circular theory that the performance characteristics identify and
define the design of its motor can be gleaned from Kjer's testimony to the effect that the
Astromec motor must be the same as the Montevideo motor because the Astromec motor
works: "You change the lamination, you change the magnet, your going to change my
design. . . .  If you change my design at all, it will not work."  (Trial Tr. at 245.)  Kjer's *ipse
dixit* is insufficient as a matter of law to establish SL Montevideo's claims of trade secret
misappropriation.  Additionally, as noted above, the testimony does not get the Court any
closer to an identification of the specifics of any of SL Montevideo's claimed trade
secrets.

Montevideo has not presented any specific evidence to establish that those components of the motor are entitled to trade secret status.  SL Montevideo does not claim that the design of the Montevideo motor involved inventing a new component.  And there has been no sufficiently specific testimony that the individual components it used are unique or novel in themselves.

The testimony indicates that the component parts of the motor are not unique: While Kjer testified that "the magnet configuration and the lamination are unique to this design," (Trial Tr. at 242), he also testified that 12-slot laminations "in themselves" are not unique (id. at 283), and that samarim cobalt—the material the magnets are made of—is not unique (id).  That Kjer repeatedly testified that the "lamination design is unique and novel in its geometry," (see Trial Tr. at 282 (emphasis added)), does not change the fact that there has been no testimony or evidence with respect to how its geometry is "unique and novel," or—for that matter—what its geometry is.  When Kjer was specifically questioned about his statement that the lamination geometry is unique and novel, he made clear that he was not referring to the fact that it was a 12-slot lamination.  (Trial Tr. at 282-83 ("A: The lamination design is unique and novel in its geometry.  Q: So the 12-slot is unique?  A: I didn't say that.  I said in its geometry.").)  However, in describing the similarities between the "lamination geometry" in the Astromec and Montevideo motors, he testified that it was "basically" the same.  (Id. at 245.)  When asked, "in what fashion," he responded "In configuration.  They're both—they're—I mean, they're both 12-slot."  (Id.)  Furthermore, there has been no testimony as to how the rotor inertia (which Kjer defined as "the ability

of the motor to rotate and accelerate and back driven through the system" (Trial Tr. at 258))

is entitled to trade secret status.[7]  The lack of any specificity here leaves the Court guessing

as to what—exactly—SL Montevideo is claiming as its trade secrets, and this is fatal to its

claims.  Accordingly, the Court determines that SL Montevideo has failed to present

sufficient evidence from which a reasonable jury could determine that it has established the

existence of its trade secrets with adequate specificity under Minnesota law.

Since SL Montevideo has not established the existence of a legally protectable trade

secret, the Court need not determine the issue of misappropriation.  However, the Court

notes that SL Montevideo has not presented sufficient evidence from which a jury could

conclude that misappropriation occurred.  Under Minnesota law, the misappropriation of a

trade secret is either: (1) the improper acquisition of a trade secret; or (2) the disclosure or

use of a trade secret without consent.  See Sip-Top, Inc., 86 F.3d at 833 (citation omitted).

SL Montevideo has not provided any direct evidence that its trade secrets were

misappropriated by Eaton or Astromec.  And, while "[i]n some instances, the secret is so

unique that the emergence of a similar, slightly altered product gives rise to an inference of

misappropriation," Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 900 (8th Cir. 2005), SL

Montevideo has not presented evidence from which a jury could conclude that the

---

[7]Rotor inertia was among the performance characteristics contained in the Eaton
spec.  This does not, however, change the fact that SL Montevideo has not presented
evidence from which a reasonable jury could determine that rotor inertia is a legally
protectable trade secret.

Astromec and SL Montevideo motors are similar in any specific or legally significant way.[8]

Therefore, the Court determines that Defendants are entitled to judgment as a matter of law

on SL Montevideo's trade secret claims.

**B.      Breach of Contract**

SL Montevideo also brought a claim against Eaton for breach of a Proprietary

Information Agreement ("PIA") entered into by the parties in January 2000.  The PIA

provides that "[e]ach party shall keep in confidence and not disclose to any person, or

persons outside of the receiving organization any of the other Party's Proprietary

Information . . . ."  (PIA ¶ 3.)  To prevail on this claim, SL Montevideo must show, by a

preponderance of the evidence, the existence of a valid contract and that Eaton failed,

without legal justification, to perform as obligated under the contract.  Sip-Top, Inc., 86

F.3d at 830-31.

SL Montevideo has not presented sufficient evidence from which a reasonable jury

could conclude that Eaton breached the PIA.  The only evidence it has presented of Eaton's

---

[8]While Kjer did testify that he saw "reverse engineering going on all over [the Astromec motor]," (Trial Tr. at 244), and that the "similarities" between the Montevideo and Astromec motors "are visually apparent as far as performancewise," (id. at 269), that is the extent of the detail that SL Montevideo established with respect to the similarities of the motors.  When Kjer was asked about the similarities between specific component parts of the Astromec and Montevideo motors, he testified that the gage of the windings and the number of windings are not "the same" and that the rotors are not "the same."  (Id. at 310-11.)  He also testified that the Astromec motor's rotor assembly, magnets, and lamination are not within the tolerances he specified for the SL Montevideo motor.  (Id. at 332-34.)  Again, even if the Court were to overlook such testimony, none of those referenced values or dimensions of the Montevideo motor were put into evidence, which brings the lack of specificity back into focus.

transmission of information to Astromec is the information contained in Eaton's specs.

That information had been in Eaton's specs for the BDCM since the mid-1990's, and there

is no evidence to suggest that, prior to this litigation, SL Montevideo ever raised concerns

regarding its proprietary rights to the information contained in Eaton's specs.  In addition,

SL Montevideo relies on the similarities between the Montevideo and Astromec

motors—as it attempted to do with respect to its trade secret claims—as circumstantial

evidence of a breach of the PIA.  However, as mentioned above in connection with the trade

secret claims, SL Montevideo has not presented evidence of the similarities between the

motors from which a jury could infer that the PIA was breached.  SL Montevideo "cannot

rely on unreasonable inferences and speculation to establish a sufficient evidentiary basis

for a reasonable jury to find that" Eaton breached the PIA.  See Sip-Top, Inc., 86 F.3d at

833 (citation omitted).

Accordingly, having determined that SL Montevideo has failed to present sufficient

evidence from which a reasonable jury could find in its favor on any of its claims,

Defendants are entitled to judgment as a matter of law under Federal Rule of Civil

Procedure 50.

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendants' Joint Rule 50 Motion for Judgment as a Matter of Law (Doc.

No. ___ ) is **GRANTED** and the Amended Complaint (Doc. No. 11) and the

Counterclaims[9] (Doc. Nos. 23, 45) are **DISMISSED WITH PREJUDICE**.

        **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 26, 2006                               s/Richard H. Kyle       
                                               RICHARD H. KYLE
                                             United States District Judge

---

[9]Each of the Defendants brought a counterclaim against SL Montevideo, alleging that SL Montevideo "failed to conduct a reasonable or proper inquiry regarding the basis for its misappropriation claim against [the Defendants] prior to filing the Amended Complaint," and that SL Montevideo's misappropriation claims were made in bad faith. As the Court made clear at the pre-trial hearing, the issue of bad faith is for the Court to decide. Having reviewed the records and testimony, and having previously denied Defendants' Motions for Summary Judgment (Doc. No. 293), the Court determines that Defendants have failed to establish bad faith on the part of SL Montevideo, and Defendants' counterclaims (Doc. Nos. 23, 45) will be dismissed with prejudice.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

SL Montevideo Technology, Inc.,

                                    Plaintiff,

                                                        Civ. No. 03-3302 (RHK/FLN)
                                                        **MEMORANDUM OPINION**
                                                        **AND ORDER**

v.

Eaton Aerospace, LLC,
and Astromec, Inc.,

                                    Defendants.

Mark H. Verwys, Plunkett and Cooney, PC, Grand Rapids, Michigan.

Michael H. King, Elizabeth M. Bradshaw, and Bradley I. Schecter, LeBoeuf, Lamb, Greene
& MacRae, LLP, Chicago, Illinois, for Defendants.

**Introduction**

    Before the Court is Defendants' Motion for Judgment as a Matter of Law under

Federal Rule of Civil Procedure 50(a).[1]  The parties have presented almost two weeks of

testimony on SL Montevideo's claims of misappropriation of trade secrets under the

Minnesota Uniform Trade Secret Act, Minn. Stat. § 325C.01 ("MUTSA"), and breach of

contract.  SL Montevideo claims that the design of its -01 and -02 motors (collectively, the

"Montevideo motor") as a whole is proprietary and entitled to trade secret status, and that

---

    [1]The Motion was made at the conclusion of SL Montevideo's case-in-chief, taken
under advisement by the Court, and then renewed at the close of all the evidence.

certain individual components of its motor are proprietary and entitled to trade secret status—specifically: (1) the lamination, including the 12 slots; (2) the dimensions/configurations of the magnets; (3) the geometry of the magnets; (4) the windings design; and (5) the rotor inertia.  For the reasons set forth below, the Court will grant Defendants' Motion.

## Standard of Decision

Judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party."  Fed. R. Civ. P. 50(a)(1).  Granting a motion for judgment as a matter of law "is appropriate where the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict."  Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (internal quotation omitted).  The evidence is viewed "in the light most favorable to the nonmoving party."  Id. (citation omitted).

## Analysis

A.     **Misappropriation of Trade Secrets**

To qualify as a trade secret under the MUTSA, (1) the information must not be generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy.  Strategic Directions Group v. Bristol-Myers Squibb, 293 F.3d 1062, 1065 (8th Cir. 2002).  To succeed on a trade secret claim, a plaintiff must first define its

2

alleged trade secrets with sufficient specificity.  <u>Jostens, Inc. v. National Computer Sys.</u>,

318 N.W.2d 691, 699 (Minn. 1982).  Thus, where a plaintiff "assert[s] a trade secret

resides in some combination of otherwise known data [here—component parts of the

motor], . . . the combination itself must be delineated with some particularity in

establishing its trade secret status."  <u>Id.</u>; <u>see also</u> <u>Electro-Craft Corp. v. Controlled Motion,

Inc.</u>, 332 N.W.2d 890, 898 (Minn. 1983).

     Defendants argue that SL Montevideo has failed to introduce "<u>any</u> evidence at trial

specifying its claimed trade secrets" (Mem. in Supp. at 3 (emphasis in original)); that SL

Montevideo "introduced <u>no</u> evidence at trial identifying a <u>single dimension</u> or any

component, sub-assembly, or interaction between sub-assemblies that it is claiming as a

trade secret" (<u>id.</u> at 3-4 (emphasis in original)); and that, absent this evidence, "it is

impossible for any reasonable jury to find that Defendants misappropriated any trade

secrets" (<u>id.</u>).

     SL Montevideo responds that testimony it presented by one of its expert

witnesses—Dan Kjer (who also designed the Montevideo motor)—did establish the

"specific nature of [its] trade secrets."  (Mem. in Opp'n at 2.)  It points to four of its own

exhibits as support for the specificity in the record: (1) Exhibit 485—Eaton's first

specification for the -01 motor; (2) Exhibit 84—Eaton's second specification for the -01

motor; (3) Exhibit 472—Eaton's specification for the -02 motor; and (4) Exhibit

27—Eaton's specification for what ended up being the Astromec motor.  Certain of the

performance characteristics listed in Eaton's various "specs" for the Brushless DC Motor

at issue in this case ("BDCM") were derived from Montevideo's motor.  At trial, SL

Montevideo pointed to the following performance characteristics or values that were

derived from the Montevideo motor and contained in the Eaton spec given to Astromec:

weight, rotor inertia, breakaway torque, torque constant, back-EMF constant, and resistance

(phase to phase).  These performance characteristics are not design drawings; nor do they

define or delineate the physical dimensions (beyond the weight) of the motor or any of its

component parts.  Rather, the performance characteristics appear to be values that

represent certain aspects of the motor's performance.[2]

At trial and oral arguments on the instant Motion, SL Montevideo advanced the

theory that the performance characteristics listed above were so integral to the design of

the Montevideo motor, that Eaton's action in providing those numbers to Astromec

virtually guaranteed that the Astromec and Montevideo motors would be the same.  Kjer

testified on that topic as follows:

> the internal part of [the Astromec] motor that is important to the function of
> that motor are basically the same, have similar, if not in [a] lot of cases
> identical.  They have to be because [Eaton] specified my design parameters.
> And how can you get to my design parameters without being very close to
> what my design is?  You cannot do that.

---

[2]For example, the rotor inertia "is the ability of the motor to rotate and accelerate
and back driven through the system" (Trial Tr. at 258); the breakaway torque, measured in
inch ounces, cannot be determined until the motor is built and designed (id. at 258-59); the
torque constant, measured in inch ounces per amp, is "how much current the motor is going
to draw from whatever torque you are operating at" (id. at 260); and the back-EMF constant
"is a voltage generated by the motor if it's not turning under its own power," and/or "is
derived and can be directly related to the . . . torque constant" (id. at 261-62).

4

(Trial Tr. at 320.)  Upon questioning from the Court at oral argument on the instant Motion,

counsel for SL Montevideo contended that any motor with the performance characteristics

specified in Eaton's specs would constitute a misappropriation of SL Montevideo's trade

secrets, regardless of whether the <u>designs</u> of the motors were the same.

While SL Montevideo did offer Eaton's specs as exhibits in its case-in-chief (as

discussed above), it did not introduce any exhibits to delineate the physical design

properties of its motor or the component parts of its motor.  And while it designated its

"green package"—the document that contains Kjer's entire design for the Montevideo

motor—on its exhibit list, it did not attempt to offer the green package into evidence during

Kjer's testimony (despite some discussion of the green package during that testimony), nor

was Kjer directed to any specific drawings in the green package during his testimony.  In

fact, prior to SL Montevideo resting, the Court asked counsel for SL Montevideo directly

whether he planned to offer the "green package" as an exhibit and he said that he did not.[3]

---

[3]Subsequent to the initial hearing on the instant Motion at which Court expressed
some scepticism regarding the ability of SL Montevideo to identify its trade secrets with
adequate specificity, and two days into Defendants' presentation of evidence, counsel for
SL Montevideo moved to reopen his proofs in order to offer the green package, along with
two other documents, as exhibits.  He did not offer the Court any explanation, other than
oversight on his part, for his withholding of the documents during his case-in-chief.  Having
determined that counsel's assertion of "oversight" was not credible—rather, that counsel's
initial decision to keep the documents out of evidence during his case-in-chief was a
deliberate and strategic one—the Court concluded that he lacked good cause for reopening
his proofs and denied the Motion.  Again, after the close of Defendants' case, counsel for
SL Montevideo attempted to offer the documents in rebuttal, without calling a witness to
testify about, and/or lay foundation for, the documents.  Defendants objected to the
documents being offered in rebuttal, and the Court sustained the objection.  In addition, the
Court notes that it has serious doubts as to the value, under Federal Rule of Evidence 401,

The Minnesota Supreme Court has made clear that "[s]imply to assert a trade secret

resides in some combination of otherwise known data is not sufficient, as the combination

itself must be delineated with some particularity in establishing its trade secret status."

Jostens, Inc., 318 N.W.2d at 699 (citation omitted).  In a case involving brushless motors

(as this one does), the court held that the plaintiff failed to establish a trade secret for lack

of specificity where it "did [not] even introduce the dimensions, tolerances, etc. of the

brushless motor into evidence."  Electro-Craft Corp., 332 N.W.2d at 898; see also VFD

Consulting, Inc. v. 21st Servs., — F. Supp. 2d —, 2006 WL 680554, at *9 (N.D. Cal. Mar.

13, 2006) (applying Minnesota law, and noting that the plaintiff had not established a trade

secret where it "[had] not identified, with any particularity, how [its designer] organized or

combined the materials in a manner that rises to the level of a legally protectable trade

secret").

The Minnesota motor or how the specific component parts of the Montevideo

Here, SL Montevideo has not presented any testimony or exhibits establishing with

particularity what its claimed trade secrets are.  It has not identified the dimensions of the

"guts"[4] of the Montevideo motor or how the specific component parts of the Montevideo

motor are combined in the "guts" to constitute a trade secret when taken as a whole.  See

Jostens, 318 N.W.2d at 699.  Further, despite being on notice of Defendants' Motion, SL

Montevideo failed to introduce into evidence (through Defendants' witnesses or through a

---

of allowing such documents into evidence without any corresponding detailed testimony
concerning the meaning or content of those documents.

[4]Kjer referred to the "guts" of the Montevideo motor as proprietary, and testified
that the "guts" of the Montevideo and Astromec motors are "the same."  (Trial Tr. at 320.)

6

rebuttal witness) its design drawings, detailed testimony, or any other evidence that specifies what its claimed trade secrets are. The only documents in evidence that contain any dimensions are Eaton's own specs.

For example, in response to the instant Motion, SL Montevideo asserts that Kjer testified that the "width, thickness, and overall geometry of the samarium cobalt magnets . . . is co-designed with the lamination geometry to produce an overall magnetic performance." (Mem. in Opp'n at 3.) But Kjer did not testify as to the width or thickness of the magnets. Nor did Kjer testify as to the dimensions of the Montevideo motor generally, or to the combination of components with sufficient particularity to identify how the components combine to establish SL Montevideo's trade secret in the motor as a whole.[5]

Kjer testified numerous times to the effect that "[w]hat makes the [Montevideo] motor unique and novel is the combination of all of the inclusive parts and the design configuration," (Trial Tr. at 282), that "one thing does not constitute a design," (id. at 226), and that "you can't look at the design in one specific area, you have to look at them all" (id.

---

[5]The Court notes that the lack of testimony from Kjer regarding the specifics of the design and dimensions of the Montevideo motor does not appear to result from a lack of knowledge on his part. Kjer designed the Montevideo motor, and his testimony demonstrated that he has extensive motor design experience and expertise. He was capable of testifying to the specifics of his motor and he had the green package with him when he took the stand, which contained the entire design for the Montevideo motor. But that testimony was not elicited from him. Furthermore, despite having been apprised of the Court's concerns regarding the lack of specificity in the record, SL Montevideo did not elect to re-call Kjer, or any other witness, in rebuttal.

at 227).  But he was never asked to testify in any detail regarding the specifics of <u>how</u> the

Montevideo motor, as a whole, is unique and novel such that it would be entitled to trade

secret status.

      In addition, the performance characteristics that SL Montevideo now so heavily

relies upon do not delineate its trade secrets with specificity.  The performance

characteristics of weight, breakaway torque, torque constant, back-EMF constant, and

resistance (phase-to-phase) are <u>not</u> themselves claimed as trade secrets.  SL Montevideo

has always claimed the <u>design</u> of its motor as a whole, and certain of its component parts,

as trade secrets.  While Kjer testified that the performance characteristics cannot be

produced from a motor that is not "very close to what [his] design is," (Trial Tr. at 320), this

testimony simply <u>does not</u> identify with <u>any</u> specificity or particularity <u>what that design is</u>.[6]

Therefore, the Court determines that SL Montevideo has not presented evidence from

which a reasonable jury could conclude that the Montevideo motor, as a whole, has been

identified with sufficient specificity to constitute a trade secret under Minnesota law.

      With respect to the five individual components of the Montevideo motor, again SL

---

[6]SL Montevideo's circular theory that the performance characteristics identify and
define the design of its motor can be gleaned from Kjer's testimony to the effect that the
Astromec motor must be the same as the Montevideo motor because the Astromec motor
works: "You change the lamination, you change the magnet, your going to change my
design. . . .  If you change my design at all, it will not work."  (Trial Tr. at 245.)  Kjer's *ipse
dixit* is insufficient as a matter of law to establish SL Montevideo's claims of trade secret
misappropriation.  Additionally, as noted above, the testimony does not get the Court any
closer to an identification of the specifics of any of SL Montevideo's claimed trade
secrets.

Montevideo has not presented any specific evidence to establish that those components of the motor are entitled to trade secret status.  SL Montevideo does not claim that the design of the Montevideo motor involved inventing a new component.  And there has been no sufficiently specific testimony that the individual components it used are unique or novel in themselves.

The testimony indicates that the component parts of the motor are not unique: While Kjer testified that "the magnet configuration and the lamination are unique to this design," (Trial Tr. at 242), he also testified that 12-slot laminations "in themselves" are not unique (id. at 283), and that samarim cobalt—the material the magnets are made of—is not unique (id).  That Kjer repeatedly testified that the "lamination design is unique and novel in its geometry," (see Trial Tr. at 282 (emphasis added)), does not change the fact that there has been no testimony or evidence with respect to how its geometry is "unique and novel," or—for that matter—what its geometry is.  When Kjer was specifically questioned about his statement that the lamination geometry is unique and novel, he made clear that he was not referring to the fact that it was a 12-slot lamination.  (Trial Tr. at 282-83 ("A: The lamination design is unique and novel in its geometry.  Q: So the 12-slot is unique?  A: I didn't say that.  I said in its geometry.").)  However, in describing the similarities between the "lamination geometry" in the Astromec and Montevideo motors, he testified that it was "basically" the same.  (Id. at 245.)  When asked, "in what fashion," he responded "In configuration.  They're both—they're—I mean, they're both 12-slot."  (Id.)  Furthermore, there has been no testimony as to how the rotor inertia (which Kjer defined as "the ability

of the motor to rotate and accelerate and back driven through the system" (Trial Tr. at 258))

is entitled to trade secret status.[7]   The lack of any specificity here leaves the Court guessing

as to what—exactly—SL Montevideo is claiming as its trade secrets, and this is fatal to its

claims.  Accordingly, the Court determines that SL Montevideo has failed to present

sufficient evidence from which a reasonable jury could determine that it has established the

existence of its trade secrets with adequate specificity under Minnesota law.

        Since SL Montevideo has not established the existence of a legally protectable trade

secret, the Court need not determine the issue of misappropriation.  However, the Court

notes that SL Montevideo has not presented sufficient evidence from which a jury could

conclude that misappropriation occurred.  Under Minnesota law, the misappropriation of a

trade secret is either: (1) the improper acquisition of a trade secret; or (2) the disclosure or

use of a trade secret without consent.  See Sip-Top, Inc., 86 F.3d at 833 (citation omitted).

SL Montevideo has not provided any direct evidence that its trade secrets were

misappropriated by Eaton or Astromec.  And, while "[i]n some instances, the secret is so

unique that the emergence of a similar, slightly altered product gives rise to an inference of

misappropriation," Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 900 (8th Cir. 2005), SL

Montevideo has not presented evidence from which a jury could conclude that the

---

        [7]Rotor inertia was among the performance characteristics contained in the Eaton
spec.  This does not, however, change the fact that SL Montevideo has not presented
evidence from which a reasonable jury could determine that rotor inertia is a legally
protectable trade secret.

Astromec and SL Montevideo motors are similar in any specific or legally significant way.[8]

Therefore, the Court determines that Defendants are entitled to judgment as a matter of law

on SL Montevideo's trade secret claims.

**B.      Breach of Contract**

SL Montevideo also brought a claim against Eaton for breach of a Proprietary

Information Agreement ("PIA") entered into by the parties in January 2000.  The PIA

provides that "[e]ach party shall keep in confidence and not disclose to any person, or

persons outside of the receiving organization any of the other Party's Proprietary

Information . . . ."  (PIA ¶ 3.)  To prevail on this claim, SL Montevideo must show, by a

preponderance of the evidence, the existence of a valid contract and that Eaton failed,

without legal justification, to perform as obligated under the contract.  Sip-Top, Inc., 86

F.3d at 830-31.

SL Montevideo has not presented sufficient evidence from which a reasonable jury

could conclude that Eaton breached the PIA.  The only evidence it has presented of Eaton's

---

[8]While Kjer did testify that he saw "reverse engineering going on all over [the Astromec motor]," (Trial Tr. at 244), and that the "similarities" between the Montevideo and Astromec motors "are visually apparent as far as performancewise," (id. at 269), that is the extent of the detail that SL Montevideo established with respect to the similarities of the motors.  When Kjer was asked about the similarities between specific component parts of the Astromec and Montevideo motors, he testified that the gage of the windings and the number of windings are not "the same" and that the rotors are not "the same."  (Id. at 310-11.)  He also testified that the Astromec motor's rotor assembly, magnets, and lamination are not within the tolerances he specified for the SL Montevideo motor.  (Id. at 332-34.)  Again, even if the Court were to overlook such testimony, none of those referenced values or dimensions of the Montevideo motor were put into evidence, which brings the lack of specificity back into focus.

transmission of information to Astromec is the information contained in Eaton's specs.

That information had been in Eaton's specs for the BDCM since the mid-1990's, and there

is no evidence to suggest that, prior to this litigation, SL Montevideo ever raised concerns

regarding its proprietary rights to the information contained in Eaton's specs. In addition,

SL Montevideo relies on the similarities between the Montevideo and Astromec

motors—as it attempted to do with respect to its trade secret claims—as circumstantial

evidence of a breach of the PIA. However, as mentioned above in connection with the trade

secret claims, SL Montevideo has not presented evidence of the similarities between the

motors from which a jury could infer that the PIA was breached. SL Montevideo "cannot

rely on unreasonable inferences and speculation to establish a sufficient evidentiary basis

for a reasonable jury to find that" Eaton breached the PIA. See Sip-Top, Inc., 86 F.3d at

833 (citation omitted).

Accordingly, having determined that SL Montevideo has failed to present sufficient

evidence from which a reasonable jury could find in its favor on any of its claims,

Defendants are entitled to judgment as a matter of law under Federal Rule of Civil

Procedure 50.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendants' Joint Rule 50 Motion for Judgment as a Matter of Law (Doc.

No. ___ ) is **GRANTED** and the Amended Complaint (Doc. No. 11) and the

Counterclaims[9] (Doc. Nos. 23, 45) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 26, 2006                                         s/Richard H. Kyle
                                                            RICHARD H. KYLE
                                                            United States District Judge

---

[9]Each of the Defendants brought a counterclaim against SL Montevideo, alleging
that SL Montevideo "failed to conduct a reasonable or proper inquiry regarding the basis
for its misappropriation claim against [the Defendants] prior to filing the Amended
Complaint," and that SL Montevideo's misappropriation claims were made in bad faith.   As
the Court made clear at the pre-trial hearing, the issue of bad faith is for the Court to
decide.   Having reviewed the records and testimony, and having previously denied
Defendants' Motions for Summary Judgment (Doc. No. 293), the Court determines that
Defendants have failed to establish bad faith on the part of SL Montevideo, and Defendants'
counterclaims (Doc. Nos. 23, 45) will be dismissed with prejudice.